1    **WO**

2                          NOT FOR PUBLICATION

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT**

7                    **FOR THE DISTRICT OF ARIZONA**

8

9    Jeffrey Green,                          No. CV-15-02570-PHX-DJH

10               Plaintiff,                   **ORDER**

11   v.

12   City of Phoenix,

13               Defendant.

14

15          Before the Court is Defendant City of Phoenix's ("City") Motion for Federal Rule

16   of Civil Procedure ("Rule") 50 Judgment as a Matter of Law (Doc. 129).  Plaintiff filed a

17   Response (Doc. 162) and the City filed a Reply (Doc. 166).  Upon consideration of the

18   same and for the foregoing reasons, the Court finds that as a matter of law, a reasonable

19   jury would not have had a legally sufficient evidentiary basis to find for Plaintiff on his

20   claim of retaliation.  Accordingly, the Court will grant the City's Motion.

21   **I.      BACKGROUND**

22          **A.      Procedural History**

23          On December 17, 2015, Plaintiff filed his Complaint against the City alleging a

24   single claim of retaliation under Title VII of the Civil Rights Act of 1964.  (Doc. 1).

25   Plaintiff alleged multiple instances of retaliation after he engaged in protected activity.  A

26   six-day jury trial was held in April 2019.  (Docs. 118, 119, 121, 123, 131, 133).  At the

27   close of Plaintiff's case-in-chief, the City orally moved for judgment as a matter of law

28   pursuant to Rule 50 (Doc. 175 at 151-58), and Plaintiff responded.  (*Id.* at 159-65).

However, because the City's oral motion was accompanied by written memoranda (Doc. 129), the Court reserved ruling on the Motion and told the parties that it intended to give Plaintiff adequate time to respond in writing to the Motion. (Doc. 176 at 7). In the meantime, the parties continued with trial. At the close of the City's case, it "reurge[d]" its Motion. (*Id.* at 10). The Court took the matter under advisement and the case was submitted to the jury. (*Id.*) On April 10, 2019, the jury entered a verdict, finding that Plaintiff engaged in protected activity, the City subjected Plaintiff to one or more adverse employment actions because he engaged in protected activity, and Plaintiff suffered damages as a result of the adverse employment action. (Doc. 134).

**B.** **Evidence Presented at Trial[1]**

**i.** ***Plaintiff Joins the City of Phoenix Police Department***

Plaintiff joined the City of Phoenix Police Department ("Police Department") in 1994. (Doc. 170 at 140; Doc. 175 at 35). In 2003, Plaintiff was promoted to sergeant and he continued to hold this rank at the time of trial. (Doc. 173 at 20). Plaintiff has held a variety of assignments while employed with the Police Department, including working with the Special Assignment Unit ("SAU"),[2] the Professional Standards Bureau ("PSB"), the Legal Department, and the Mounted Unit. (Doc. 170 at 140-41, 190-208; Doc. 173 at 20-32).

While working in the Mounted Unit, Plaintiff told his supervisor, Lieutenant Jeff Lazell ("Lt. Lazell"), that he was experiencing discrimination. (Doc. 173 at 32). Plaintiff subsequently filed an Equal Employment Opportunity Commission ("EEOC") charge on December 11, 2009 ("2009 EEOC charge"), alleging discriminatory harassment.

---

[1] The Court will only recite the evidence that is relevant to Plaintiff's claim. The Court is mindful that a Rule 50 motion requires it to review all of the evidence in the record; however, the Court must consider the evidence in the light most favorable to Plaintiff and give him the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). In other words, the Court will give credence to the evidence favoring Plaintiff as well as that evidence supporting the City that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses. *See Reeves*, 530 U.S. at 151.

[2] SAU is the Police Department's SWAT team. (Doc. 170 at 203).

(Doc. 170 at 140; Doc. 173 at 32-33). The 2009 EEOC charge was resolved by a settlement agreement between the parties, and as part of that settlement, Plaintiff elected to be transferred from the Mounted Unit to the Robbery Unit ("Robbery"). (Doc. 170 at 140; Doc. 173 at 32-33).[3]

### ii. Plaintiff Transfers to Robbery

Plaintiff transferred to Robbery, a unit within the Violent Crimes Bureau ("VCB"), on December 5, 2011.[4] (Doc. 170 at 140). Despite never having worked in Robbery, nor having been a case-carrying detective[5] before, as a Robbery sergeant, Plaintiff would be responsible for supervising a squad of case-carrying detectives. (Doc. 175 at 36-38). At the time of Plaintiff's transfer to Robbery, the VCB commander was David Faulkner ("Commander Faulkner") and the Robbery lieutenant was Lisa Messina ("Lt. Messina").[6] (Doc. 170 at 140-41; Doc. 173 at 36, 39). Before Plaintiff's transfer to Robbery, he learned

---

[3]    Plaintiff disputes the City's testimony that his 2009 EEOC settlement led to the creation of a new Robbery sergeant position for him. (*Compare* Doc. 173 at 35, *with* Doc. 172 at 130-31). Plaintiff testified that he assumed a vacant sergeant position. (Doc. 173 at 35).

[4]    The Police Department is comprised of multiple divisions, each division includes several different bureaus, and each bureau is made up of units. For example, Robbery is a unit within the VCB and the VCB is a bureau within the Investigations Division.

[5]    A case-carrying detective is "a detective who is assigned to investigate a particular event to a potential crime and carry [that investigation] though to the end . . . ." (Doc. 175 at 37).

[6]    The Police Department operates within a chain of command system, and uses a significant amount of jargon. Some explanation of its chain of command system is therefore helpful. Each division is led by an assistant chief, each bureau is led by a commander, and each unit is led by a lieutenant. Assistant chiefs manage and supervise the commanders assigned to the bureaus within that division. (Doc. 172 at 130). Commanders supervise and manage the lieutenants assigned to the units within that bureau. (Doc. 171 at 40-41). Lieutenants supervise and manage the sergeants within that unit. (*Id.* at 39).
In Robbery, there are multiple sergeants who each supervise and manage a squad of detectives. (Doc. 171 at 41-43; Doc. 172 at 171). Thus, the Robbery chain of command, from bottom to top, is as follows: Robbery detectives report to their assigned sergeant, Robbery sergeants report to the Robbery lieutenant, the Robbery lieutenant reports to the VCB commander, the VCB commander reports to the Investigation Division Assistant Chief, and the Investigation Division Assistant Chief reports to the Chief of Police. At the time Plaintiff transferred to Robbery, the chain of command was such that Plaintiff reported to Lt. Messina, Lt. Messina reported to Commander Faulkner, Commander Faulkner reported to Assistant Chief Jim Pina, and Assistant Chief Jim Pina reported to Chief Daniel Garcia. (*Id.* at 128, 130; Doc. 171 at 178).

that Commander Faulkner was the cousin[7] of Lt. Lazell, the lieutenant who was the focus of his 2009 EEOC charge. (Doc. 173 at 36). Assistant Chief Jim Pina ("Assistant Chief Pina") informed Commander Faulkner that Plaintiff had been reassigned to Robbery. (Doc. 172 at 130). Commander Faulkner held a meeting with the entire unit to inform them that Plaintiff would be joining Robbery as a sergeant. (Doc. 170 at 145-46).

Plaintiff testified that shortly after starting in Robbery, he met with Commander Faulkner and expressed his concerns about reporting to him because he was Lt. Lazell's cousin. (Doc. 173 at 37-39). Plaintiff testified that Commander Faulkner responded by stating that "if you stand by the river long enough your enemies will float past you" and that "I'm kind of a conspirator myself"; which Plaintiff understood to mean that Commander Faulkner thought Plaintiff's 2009 EEOC charge was a conspiracy against Lt. Lazell. (*Id.* at 38). Separately and without any input from Commander Faulkner, Lt. Messina met with Plaintiff for approximately six hours over the course of two days to welcome Plaintiff to Robbery. She provided him with a Performance Expectations Memorandum, which explained her expectations for Robbery sergeants, and a Goal Setting Worksheet that detailed Plaintiff's work responsibilities. (*Id.* at 39; Doc. 172 at 175; Defendant's Trial Exhibits ("Def. Exs.") 31 and 32). Plaintiff testified that he thought the meeting with Lt. Messina was "hostile" and he felt like she was "scolding [him]" on her list of expectations. (Doc. 173 at 40). In fact, on Plaintiff's first or second day in Robbery, Plaintiff complained to Ms. Marquita Beene ("Ms. Beene"), an City of Phoenix's Equal Opportunity Department ("EOD") employee, that he thought he was being subjected to retaliation. (Doc. 172 at 194, 212-13; Doc. 175 at 47).

Nonetheless, Plaintiff testified that he understood that his performance evaluations would be based on the whether he met the goals in the Goal Setting Worksheet. (Doc. 175 at 49). The Goal Setting Worksheet included the following goals: "[t]horoughly review all

---

[7] Commander Faulkner and Lt. Lazell are not cousins, rather Commander Faulkner is technically Lt. Lazell's step-uncle. (Doc. 172 at 131-32). However, Commander Faulkner and Lt. Lazell have referred to one another as cousins since they were children. (*Id.*) Thus, the Court will follow suit, and refer to Commander Faulkner and Lt. Lazell as cousins.

of your squad's search warrants, tactical plans, and robbery bulletins prior to service or dissemination for accuracy and validity"; and "[m]aintain well documented supervisory notes on your assigned employees . . . [and] [s]ubmit to the Lieutenant by the fifth of each month." (Def. Ex. 31 at 1-2).

On February 9, 2012, Plaintiff reviewed a search warrant, but failed to confirm the description of the location in the warrant was complete and accurate before the warrant was presented to the judge. (Doc. 175 at 56). The location was incorrect, and Plaintiff's squad served the search warrant on the wrong location, during which the homeowner's dog was killed. (*Id.* at 57). PSB subsequently investigated the incident. (*Id.* at 57-58). After the investigation, PSB found that in the process of obtaining and serving the warrant, Plaintiff violated a Police Department policy, failed to properly supervise, and neglected his duties. (*Id.* at 58-59). Plaintiff then took stress-related leave from February 23, 2012, to April 6, 2012, because he felt like his superiors were trying to "unfairly discipline [him] out of the unit . . . ." (Doc. 173 at 56; Doc. 175 at 59).

On April 6, 2012, after returning from this leave, Plaintiff filed an EEOC charge ("April 2012 EEOC charge"). In this charge, Plaintiff claimed that his alleged hostile reception into Robbery was in retaliation for his 2009 EEOC charge. (Doc. 170 at 141; Doc. 173 at 45-46, 56). Then on April 24, 2012, Officer Candice Wilson ("Ms. Wilson"),[8] the only female detective on Plaintiff's squad, came to Plaintiff and reported that she had been sexually harassed by a Police Department sergeant. (Doc. 173 at 46-47, 53). Plaintiff, as her supervisor, assisted her in filing a complaint with the EOD. (Doc. 170 at 141; Doc. 173 at 46-47, 53). Plaintiff also personally notified EOD and Lt. Messina of Ms. Wilson's complaint. (Doc. 173 at 48-49).

### iii.    *Plaintiff's First Work Fitness Evaluation*

On May 7, 2012, Assistant Chief Pina notified Plaintiff that he would be assigned to work from home and he would be required to undergo a work fitness evaluation. (Doc. 170 at 141; Doc. 173 at 54; Def. Ex. 66). A work fitness evaluation, also known as

---

[8] Officer Wilson has since left the City's Police Department.

a fitness for duty evaluation, is managed by the City's Human Resources Department. An employee is referred to one when the employee conducts himself in a manner that causes those in the organization to be concerned about the employee's ability to safely perform his job duties. (Doc. 172 at 227). Plaintiff testified that he was not given a reason for the work fitness evaluation, nor did he have any idea why he was required to undergo it. (Doc. 173 at 54-55). On May 9, 2012, Dr. Phillip Lett ("Dr. Lett") completed Plaintiff's work fitness evaluation. (Doc. 175 at 66-67). Dr. Lett recommended that Plaintiff was fit for duty, provided that he attend counseling on a weekly basis for a month and then every other week for three months. (*Id.* at 68-69). And Plaintiff did so. (*Id.*).

When Plaintiff returned to work on June 4, 2012, Lt. Messina had been replaced by Lieutenant Joseph Tomory ("Lt. Tomory") as the Robbery lieutenant. (Doc. 173 at 57; Plaintiff's Trial Exhibit ("Pl. Ex.") 21). In the month that Lt. Tomory was the Robbery lieutenant, Plaintiff testified that Lt. Tomory gave him orders to retaliate against Ms. Wilson. (Doc. 173 at 57). On July 2, 2012, Lt. Finley replaced Lt. Tomory as the Robbery lieutenant. (Doc. 170 at 141; Doc. 173 at 62; Def. Ex. 45). Plaintiff testified that he and Lt. Finley met on July 9, 2012, to discuss Ms. Wilson and during that meeting, Lt. Finley instructed Plaintiff to "get rid" of her. (Doc. 173 at 64). At trial, Plaintiff agreed that Ms. Wilson had engaged in unprofessional conduct when she posted several comments on Facebook, including a comment that implied that another female Robbery detective was a "hypocritical Christian." (Doc. 175 at 77-78). Plaintiff further agreed that Ms. Wilson's behavior was inappropriate and could cause conflict between coworkers and disrupt the workplace. (Doc. 175 at 77-81).

In his supervisor notes from July and August 2012, Lt. Finley made several remarks about Plaintiff's failure to practice open and effective communication and that Plaintiff had failed to timely complete administrative paperwork. (Def. Exs. 45, 46). Specifically, Lt. Finley noted that Plaintiff continued to turn in his supervisory notes and case management reviews late. (Def. Exs. 45, 46). The case management reviews are particularly important to Robbery because it is the process by which the unit tracks the status of cases to ensure

that all cases are timely investigated.  (Doc. 171 at 105-06).

### iv.    *Plaintiff's Second Work Fitness Evaluation*

On August 8, 2012, Lt. Finley met with Plaintiff.  (Doc. 173 at 67).  Lt. Finley testified that in a matter of weeks, there had been four reports of Ms. Wilson's disruptive behavior that were unrelated to her sexual harassment complaint.  (Doc. 171 at 190-92, 199-201).  He further testified that he knew of Ms. Wilson's pending sexual harassment complaint, but he still expected Plaintiff to investigate the multiple reports of unrelated disruptive behavior to determine if supervisory intervention was necessary.  (*Id.* at 192, 199-201).  Lt. Finley testified that he did not believe that he had asked Plaintiff to retaliate against Ms. Wilson, rather he had asked him to investigate the multiple allegations of her disruptive behavior.  (*Id.* at 187, 190-201).

Plaintiff testified that during that meeting Lt. Finley directed Plaintiff to "give [Ms.] Wilson a supervisory counseling."  (Doc. 173 at 67).  A "supervisory counseling" is a written notice from a supervisor to an employee that puts the employee on notice that the employee violated a policy and is considered to be "on the low end of the discipline matrix."  (Doc. 171 at 155, 223).  Plaintiff testified that he told Lt. Finley that he could not give Ms. Wilson a supervisory counseling and Lt. Finley responded by getting red in the face and asking him, "Are you disobeying a lawful order?"  (*Id.*)  Plaintiff abruptly left stating that he was going to see Assistant Chief Blake McClelland ("Assistant Chief McClelland").[9]  (*Id.* at 71-72).  Even though Plaintiff acknowledged that Ms. Wilson's behavior was disruptive, Plaintiff nevertheless believed that Lt. Finley's order to give her a supervisory counseling was in retaliation for her sexual harassment complaint.  (*Id.* at 63-64, 73-74).  Soon after his exchange with Lt. Finley, Plaintiff met with Assistant Chief McClelland and told him that he believed that Lt. Finley ordered him to retaliate against Ms. Wilson.  (Doc. 173 at 72-73).  Assistant Chief McClelland told Plaintiff to return to his office to write a detailed memorandum of his allegations regarding the alleged retaliation.  (*Id.* at 75-76).

---

[9]    By this time, Assistant Chief Pina had been replaced by Assistant Chief McClelland.  (Doc. 172 at 143).

After Plaintiff left Lt. Finley's office, Lt. Finley went to see Commander Faulkner. (Doc. 171 at 210-12). Commander Faulkner testified that when Lt. Finley came to his office, he "looked scared" and told him that there had been an incident with Plaintiff who was now on his way to see Assistant Chief McClelland. (Doc. 172 at 151-54). Lt. Finley testified that Plaintiff's behavior was erratic, causing him to fear for his safety and the safety of other employees. (Doc. 171 at 202-06). That evening, Lt. Finley and Lt. Tomory notified Plaintiff that Assistant Chief McClelland directed them to place Plaintiff on paid administrative leave and notified him that he was to undergo a second work fitness exam.[10] (Doc. 170 at 141; Doc. 173 at 80-81). Plaintiff was on administrative leave for approximately three and half months, during which Plaintiff was paid; however, he was required to exhaust his sick leave. (Doc. 173 at 81).

While on administrative leave, Dr. Lett evaluated Plaintiff for his second work fitness evaluation on September 4 and 5, 2012. (Doc. 175 at 82-83; Def. Ex. 66). Dr. Lett recommended that Plaintiff "[u]ndergo a psychiatric consultation/evaluation for differentiating diagnosis and facilitating treatment planning prior to returning to full duty[,]" "[u]ndergo psychotherapy . . . at least weekly for 6 weeks and twice a month for five months afterwards[,]" and "may profit from training in the area of interpersonal communication effectiveness." (Def. Ex. 66 at 2 (PHX001377)[11]). Dr. Lett reported that "there appear[ed] to be a pattern of conflict between [Plaintiff] and authority[,]" that Plaintiff had a pattern of not complying with requests and orders from supervisors, and that Plaintiff "appear[ed] unwilling to examine any personal responsibility in [the] conflict." (*Id.* at 17 (PHX001392)). Dr. Lett further reported that Plaintiff presented with the

---

[10] The City has argued that Veronica Costa, a City employee, referred Plaintiff for his second work fitness evaluation, thereby implying that Ms. Costa was the decision maker for Plaintiff's work fitness evaluation. (Doc. 166 at 6-7). However, Dr. Lett's report from Plaintiff's work fitness evaluation stated that Ms. Costa referred Plaintiff for a work fitness evaluation "at the request of [Lt.] Finley, [Plaintiff's] supervisor." (Def. Ex. 66 at 5 (PHX001380)). Even though Lt. Finley may have been merely carrying out Assistant Chief McClelland's orders, the Court will nonetheless treat Lt. Finley as the decision maker for Plaintiff's second work fitness exam.

[11] As the trial exhibits do not have an ECF page number, the Court will refer to the City's Bates stamp page number for convenience and clarity.

following personality traits that included suspiciousness, lack of trust, conflict with authority, anxiety, obsessive thinking, and paranoia. (*Id.* at 18 (PHX001393); Doc. 175 at 85).

> **v.** **Plaintiff's November 27, 2012 EEOC Charge and 2012 Performance Management Guide ("PMG")**

Plaintiff returned to work on November 20, 2012; however, he did not return to full duty until December 7, 2012. (Doc. 174 at 6-7; Doc. 175 at 7, 9, 85-86). On November 27, 2012, Plaintiff filed another EEOC charge ("November 2012 EEOC charge"), in which he alleged that Lt. Finley retaliated against him for assisting Ms. Wilson in filing her sexual complaint and for refusing to comply with Lt. Finley's order that Plaintiff thought was retaliatory. (Doc. 170 at 141; Pl. Ex. 10A). The EEOC subsequently investigated the November 2012 EEOC and issued a determination ("EEOC cause determination") in which it found "that there [was] reasonable cause to believe that [the City] violated Title VII when it placed [Plaintiff] on administrative leave, and required him to undergo a fitness for duty examination in retaliation for his participation in a protected activity and opposition to actions he believed to be discriminatory." (Pl. Ex. 11). Lt. Finley, however, only learned that Plaintiff aided Ms. Wilson with her complaint while testifying at trial and he testified that he did not know about Plaintiff's November 2012 EEOC charge. (Doc. 171 at 192-94).

On December 12, 2012, Plaintiff met with Lt. Collins and Commander Benny Pina.[12] (Doc. 171 at 143). At this meeting, Plaintiff was served with his August 29, 2012 PMG[13] ("2012 PMG"); a supervisory counseling, dated August 20, 2012, for failing to timely complete employee notes and case management inspections; and a Performance Objective Memo, which addressed the areas of Plaintiff's performance that had fallen

---

[12] By this time, Commander Pina had replaced Commander Faulkner. (Doc. 171 at 143). It should be noted that Assistant Chief Pina is not the same person as Commander Pina.

[13] A PMG is the name of the annual review that all employees receive from their supervisors. (Doc. 171 at 66-68, 219). A PMG includes an overall "met" or "not met" and also includes six Core City Value categories and twenty-eight Duties and Goals categories. (Doc. 174 at 26).

below standards as documented in his 2012 PMG. (Doc. 171 at 223-27; Doc. 172 at 76-77; Pl. Ex. 18; Def. Exs. 44, 50, 51). Plaintiff's 2012 PMG was not served until December 12, 2012, because he was on administrative leave from August 8, 2012, to November 20, 2012. (Doc. 171 at 226).

In his 2012 PMG, Plaintiff received an overall performance expectation of "met" but he received "not mets" in the Core City Value category of "learns, changes, and improves"; and in the Duties and Goals categories of practice open and effective communication; prepare and submit administrative paperwork within designated timelines; work closely with peers and lieutenant during transition to Robbery; and maintains well documented supervisory notes on assigned employees and submit those notes to lieutenant by the fifth of each month. (Doc. 171 at 233-35; Pl. Ex. 18). Plaintiff received "met" in the other four Core City Value categories and the other twenty-two Duties and Goals categories. (Doc. 171 at 227-33; Pl. Ex. 18). Lt. Finley testified that he completed the 2012 PMG with input from Commander Faulkner and Ms. Judy Boros, an employee at the City's personnel department. (Doc. 172 at 5-6).

On January 17, 2013, Plaintiff was served with two supervisory counselings, one for neglecting his standby responsibilities from December 28 through 31, 2012,[14] and the other for failing to notify Lt. Finley before serving a high-risk search warrant on January 3, 2013, and for failing to inform him of the outcome of that search warrant.[15] (Doc. 172 at 33-37; Def. Exs. 52-53, 55). On February 1, 2013, Lt. Finley served Plaintiff with

[14]    At a December 17, 2012 Robbery meeting, Plaintiff agreed to be on standby from December 28 through 31. (Doc. 175 at 91-92; Def. Exs. 50, 52). However, Plaintiff testified that when the official standby schedule was posted, he was not so scheduled. (Doc. 175 at 91-93). Therefore, Plaintiff, without confirming the schedule change with Lt. Finley, made plans to be out of town from December 28 through 31 of 2012. (Id.) Lt. Finley, understood, based on the Robbery meeting, that Plaintiff agreed to be on standby from December 28 through 31. (Doc. 172 at 33-34). Thus, when Plaintiff was unavailable on those days, Lt. Finley had to arrange for another sergeant to cover Plaintiff's standby duties. (Id. at 36).

[15]    Plaintiff was the scene supervisor for the service of a high-risk search warrant on January 3, 2013. (Doc. 172 at 37-39; Def. Ex. 55). Lt. Finley testified that he had told Plaintiff numerous times that he was to notify him whenever a warrant was to be served; however, Plaintiff failed to notify him prior to serving the warrant on January 3, 2013, and failed to inform him of the outcome of the warrant. (Doc. 172 at 38; Doc. 175 at 90; Def. Ex. 55).

another supervisory counseling, dated January 25, 2013, for neglect of duty regarding an incomplete search warrant that Plaintiff had reviewed and approved to be sent to a judge for signature. (Doc. 172 at 27-33; Def. Exs. 54, 56). The search warrant, however, was rejected by the reviewing judge because the accompanying affidavit had no information that connected the criminal activity to the address to be searched. (Doc. 172 at 31-33; Def. Ex. 54).

On February 28, 2013, Plaintiff arranged for a search warrant to be served by a Neighborhood Enforcement Team[16] ("NET") instead of SAU. (Doc. 173 at 111-15; Doc. 174 at 14-15). Lt. Finley contacted Plaintiff, after learning from other officers that there were armed robbery suspects in the home where the search warrant was to be served, and told Plaintiff that SAU, not NET, needed to serve the search warrant. (Doc. 173 at 112-13; Doc. 174 at 14-17; Def. Ex. 56 at 24 (PHX000322)). On March 1, 2013, Plaintiff met with Lt. Finley and Lt. Tomory. During that meeting Lt. Finley assigned Plaintiff to desk duty and instructed him not to serve any search warrants because he had concerns regarding Plaintiff's judgment. (Doc. 172 at 21-22; Doc. 174 at 14-17, 33-34; Def. Ex. 57 at 3 (PHX000325)). Specifically, Lt. Finley was concerned that Plaintiff had not appropriately evaluated the danger involved in serving the February 28, 2013 search warrant. (Doc. 172 at 83-85; Doc. 174 at 33).

On March 4, 2013, Plaintiff notified Lt. Finley that he was going to serve a search warrant. (Doc. 175 at 102). Lt. Finley testified that he was "dumbfounded" when Plaintiff told him that he was going to serve a search warrant, because he had just days before assigned Plaintiff to desk duty and told him not to serve search warrants. (Doc. 172 at 87-88). Accordingly, Lt. Finley told Plaintiff that he was not to serve the search warrant, and reiterated that Plaintiff was assigned to desk duty and was not to serve any search warrants. (Id. at 21-22, 88-89). Plaintiff testified that upon being told that he could not serve the search warrant, he became upset and left his office to go to EOD to make a complaint. (Doc. 173 at 115-16; Doc. 175 at 103-04). Plaintiff, however, did not seek permission, nor

---

[16] NET is a group of precinct officers who occasionally assist in serving low-risk warrants; however, typically they support neighborhood patrol officers. (Doc. 172 at 84).

did he tell Lt. Finley that he was going to EOD. Despite his desk duty assignment, Plaintiff was absent that day for approximately three and half hours. (Doc. 172 at 41-41, 87-88; Doc. 173 at 115-16; Doc. 175 at 103-04). On March 15, 2013, Plaintiff again left his desk without prior approval to make a complaint with EOD. (Doc. 173 at 119-20). The allegations that Plaintiff displayed unprofessional conduct by leaving his desk without supervisory approval on March 4, 2013, and March 15, 2013, were both investigated.[17] (Def. Ex. 80). Plaintiff received a written reprimand for displaying unprofessional conduct and failing to follow orders. (Doc. 171 at 157; Def. Ex. 81). However, the allegation that Plaintiff failed to notify Lt. Finley of the February 28, 2012 search warrant and that he had inappropriately arranged for NET to serve the search warrant were also investigated, and the allegations were determined to be unfounded. (Def. Ex. 82).

On April 29, 2013, Lt. Finley asked Commander Faulkner for a transfer out of Robbery. (Doc. 172 at 45-46, 50-53). Lt. Finley testified that he asked to be transferred for health reasons and because he did not feel safe around Plaintiff. (*Id.*) Lt. Finley accepted a position as a lieutenant working the graveyard shift[18] in South Phoenix. (*Id.* at 52-53).

In May of 2013, Lieutenant John Collins[19] ("Lt. Collins") took over as Robbery lieutenant. (Doc. 171 at 43). Before Lt. Collins started, Lt. Finley notified him of the status of the unit, including the ongoing investigations regarding Plaintiff's misconduct. (*Id.* at 74, 93-95). Based on his conversation with Lt. Finley, Lt. Collins was under the impression that Plaintiff's desk duty assignment prohibited him from leaving the office for any reason without prior supervisor approval. (Doc. 174 at 22). On May 14, 2013, Plaintiff left his office without supervisory approval for approximately fifteen to twenty minutes to get coffee, Lt. Collins, unaware that Lt. Finley had modified Plaintiff's desk duty assignment,

---

[17] The investigation was initiated by Lt. Finley, but completed by Lt. Collins. Plaintiff was served with the findings on September 4, 2013. (Def. Ex. 80).

[18] The graveyard shift is from 9:00 p.m. to 7:00 a.m. (Doc. 172 at 52).

[19] Lt. Collins was promoted to Assistant Chief in November of 2017. (Doc. 171 at 39-40). However, the Court will refer to Assistant Chief Collins as Lt. Collins, the rank he held in 2013 when he supervised Plaintiff. (*Id.* at 43).

filed a written complaint that Plaintiff had again violated orders and left his desk without prior supervisory approval. (Doc. 174 at 21-22; Def. Exs. 72, 80). During the investigation, Plaintiff provided evidence that Lt. Finley had previously modified Plaintiff's desk duty assignment to allow Plaintiff to leave the office to get coffee or lunch with prior approval. (Doc. 174 at 22). Therefore, the May 14, 2013 allegation that Plaintiff had left his desk without prior approval was determined to be unfounded. (Def. Ex. 80).

On June 4, 2013, Plaintiff returned to full duty. (Doc. 175 at 110-11; Def. Ex. 69). On June 10, 2013, Plaintiff called Lt. Collins from Colorado and told him that he had mistakenly arrived a week early for a work-related training. (Doc. 171 at 107-10; Def. Ex. 71). Instead of returning to Phoenix, Plaintiff used annual leave to stay in Colorado for the additional week. (Doc. 171 at 108-09). Plaintiff's decision to remain in Colorado required Lt. Collins to make immediate and special arrangements to cover Plaintiff's scheduled shifts. (*Id.* at 109; Def. Ex. 71).

In a memorandum dated August 22, 2013, served on Plaintiff the following day, Lt. Collins informed Plaintiff that if his performance did not improve by October 20, 2013, he would receive an overall performance expectation of "not met" on his 2013 PMG. (Doc. 171 at 127-33; Doc. 175 at 117-18; Def. Ex. 74). In the memorandum, Lt. Collins detailed numerous examples of incidents in which Plaintiff lacked professionalism, did not practice effective and open communication, did not pay attention to detail, did not complete administrative paperwork in a timely manner, and demonstrated an inability to work with his peers. (Def. Ex. 74).

### vi. *Plaintiff's "Not Met" 2013 PMG*

Plaintiff was served with his 2013 PMG, dated October 20, 2013, in November 2013. (Doc. 175 at 118; Def. Ex. 78). As a PMG is a yearly evaluation, Plaintiff's PMG evaluated his performance from October 2012 to October 2013. Lt. Collins completed the PMG; however, because he had only supervised Plaintiff since May of 2013, Lt. Collins incorporated comments and input from Lt. Finley who had supervised Plaintiff from October 2012 through April 2013. (Doc. 171 at 78, 85-91). Plaintiff received an overall

performance expectation of "not met" on his 2013 PMG ("Not Met 2013 PMG"). (Doc. 171 at 135; Def. Ex. 78). Plaintiff received "not mets" in three of the six Core City Value categories and in fourteen of the twenty-eight Duties and Goal categories. (Def. Ex. 78). The Not Met 2013 PMG also included a detailed comments section. (*Id.*) Subsequently, on November 11, 2013, pursuant to Lt. Collins's recommendation, Plaintiff was involuntarily transferred from Robbery to the Property Crimes Bureau ("Property"). (Doc. 129 at 2-4; Doc. 170 at 140-41). At the time of the trial, Plaintiff was a Property sergeant.

### C. Plaintiff's Evidence of Alleged Damages

Plaintiff testified that he was "devastat[ed]" and that his self-esteem and reputation were destroyed after going through two work fitness evaluations and several internal investigations, receiving four supervisory counselings and a written reprimand, and receiving several "not mets" on his 2012 PMG and the 2013 Not Met PMG. (Doc. 174 at 41-42; Doc. 175 at 30-34). Plaintiff testified that he felt like he was being punished in front of his peers and that is affected his self-confidence. (Doc. 174 at 41-42; Doc. 175 at 30-34). Plaintiff testified that he was worried about his career after he was involuntarily transferred to Property. (Doc. 175 at 30). One of Plaintiff's life goals was to become a Police Department commander; however, he testified that he is not eligible for a promotion because of his 2013 Not Met PMG. (*Id.* at 31). Plaintiff, however, has not applied for a promotion since August 2010. (*Id.* at 119).

Plaintiff testified that he has suffered from "severe night sweats, headaches, stomach aches, [and] backaches." (*Id.* at 32). Plaintiff took stress leave twice and was twice treated at the hospital for stress. (*Id.*) Plaintiff testified that his damages from the retaliation were pain and suffering. (*Id.* at 34). To date, Plaintiff is still working as a sergeant in the Police Department. (*Id.* at 34, 119). Aside from Plaintiff's own testimony described above, he did not introduce any supporting witnesses, evidence or documentation related to his alleged damages.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D. <u>The Jury's Verdict</u>

On April 10, 2019, after deliberating for less than three hours, the jury returned a verdict using a special verdict form. (Doc. 134). The jury found that Plaintiff engaged in protected activity, the City subjected him to one or more adverse employment actions because he engaged in protected activity, and he suffered damages as a result. (*Id.*) Thus, the jury found in favor of Plaintiff and against the City on Plaintiff's claim of retaliation. (*Id.*). The jury awarded 1.5 million dollars in damages.[20] (*Id.*)

## III. LEGAL STANDARD

Rule 50(a) permits the court to grant judgment as a matter of law if a party has been fully heard on an issue and the court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue . . . ." Where, as here, "the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). After trial, a Rule 50[21] motion may be granted only if the evidence, "permits only one reasonable

---

[20] While the Court reserved ruling on the City's Motion and submitted the action to the jury who returned a verdict, the Court can only address the arguments raised in the City's Motion. *See Summers v. Delta Air Lines, Inc.*, 508 F.3d 923, 927 (9th Cir. 2007) ("A party who has been called on to respond to a Rule 50(a) motion must have a meaningful opportunity to reply and must not be sandbagged by a decision on grounds not properly noticed."). Thus, whether the jury award was excessive is not currently before the Court. However, based on minimal evidence presented at trial regarding Plaintiff's damages, the Court doubts whether the jury's award here was supported by evidence. *See Levitant v. City of New York Human Res. Admin.*, 914 F. Supp. 2d 281, 310 (E.D.N.Y. 2012) ("Courts in circumstances similar to the instant action have found noneconomic damages in the six-figure range to be excessive where plaintiff has only established garden-variety damages, and such courts have ordered new trials unless the plaintiffs agreed to remit such awards to reasonable levels closer to the $30,000 level."), *aff'd*, 558 Fed. Appx. 26 (2d Cir. 2014). *Contra Conti v. Corp. Services Group, Inc.*, 30 F. Supp. 3d 1051, 1064 (W.D. Wash. 2014) (finding that jury's award of $170,000 in emotional distress damages to plaintiff who was transferred, had his pay cut, and was ultimately fired was not excessive and the award was within range that the evidence supported), *aff'd*, 690 Fed. Appx. 473 (9th Cir. 2017).

[21] The standard for granting a motion under Rule 50(b) is the same as the standard for granting a motion under Rule 50(a). *In re Homestore.com, Inc. Sec. Litig.*, 2011 WL 1564025, at *1 (C.D. Cal. Apr. 22, 2011); *see also Colonial Lincoln-Mercury, Inc. v. Musgrave*, 749 F.2d 1092, 1098 (4th Cir. 1984) ("While the standards for directed verdict and judgment n. o. v. (directed verdict on reserved ruling) are identical, so that, in technical contemplation, the one involves no more an intrusion on jury prerogative than the other . . . .").

conclusion, and that conclusion is contrary to the jury's verdict." *Josephs v. Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2005). The "jury's verdict must be upheld if it is supported by substantial evidence, which is evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). Moreover, a motion for judgment as a matter of law should be granted "only if the verdict is against the great weight of the evidence, or it is quite clear that the jury has reached a seriously erroneous result . . . ." *McEuin v. Crown Equip. Corp.*, 328 F.3d 1028, 1036 (9th Cir. 2003) (internal quotation marks and citation omitted), *cert. denied*, 540 U.S. 1160 (2004).

The Rule 50 standard is the same as the standard for granting a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). However, unlike in the context of a pre-trial Rule 56 motion for summary judgment, "the prudential reluctance to grant summary judgment—a complete deprivation of a trial—may be relaxed in [the Rule 50] context because the parties have had their day in court." *Thomas v. Cannon*, 289 F. Supp. 3d 1182, 1194 (W.D. Wash. 2018), *appeal dismissed*, 2018 WL 7107615 (9th Cir. Nov. 1, 2018). "And the fact that the court previously denied summary judgment does not preclude the same court from considering and ultimately granting a Rule 50 motion." *Elliott v. Versa CIC, L.P.*, 2019 WL 414499, at \*6 (S.D. Cal. Feb. 1, 2019). In evaluating a Rule 50 motion, a court does not make credibility determinations or weigh the evidence. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255. Instead, the court "must draw all reasonable inferences in favor of the nonmoving party . . . ." *Reeves*, 530 U.S. at 150. "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (internal citation omitted). In other words, "[w]hile the Court is mindful to construe all disputed facts in the light most favorable to

Plaintiff . . . the Court cannot ignore undisputed facts that provide context for or contradict Plaintiff's claims." *Drottz v. Park Electrochemical Corp.*, 2013 WL 6157858, at *12 (D. Ariz. Nov. 25, 2013).

**IV.    DISCUSSION**

To succeed on a retaliation claim under Title VII, a plaintiff must prove "that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Texas Sw. Med. Ctr. V. Nassar*, 570 U.S. 338, 362 (2013).  Initially, the burden rests with the plaintiff to establish a *prima facie* case of retaliation.  *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802 (1973).  To establish a *prima facie* case of Title VII retaliation, a plaintiff must show "(1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034–35 (9th Cir. 2006).  On the second prong, an action is cognizable as an adverse employment action if it is based on a retaliatory motive and is reasonably likely to deter employees from engaging in protected activity.  *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000) (adopting the EEOC guideline standard, which is also used in the First, Seventh, Tenth, Eleventh and D.C. Circuits)."  In other words, only "non-trivial" employment actions can ground a retaliation claim.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000); *see also Kunzler v. Rubin*, 2001 WL 34053243, at *7 (D. Ariz. Sept. 27, 2001).

If the plaintiff establishes a *prima facie* case, "the burden shifts to the defendant 'to articulate some legitimate, [nonretaliatory] reason' for the adverse action." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802).  The defendant need not prove the absence of retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of retaliation raised by the plaintiff.  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982).  If the defendant does so, "the plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"

*Chuang v. University of California Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Burdine*, 450 U.S. at 256). The goal of the pretext inquiry is not to determine whether defendant made the best employment decisions or even well-considered ones. *See Green v. Maricopa County Cmty. Coll. Sch. Dist.*, 265 F. Supp. 2d 1110, 1128 (D. Ariz. 2003). Rather, the goal is to determine the extent to which defendant's explanation of its actions is a guise for unlawful retaliation. *See Ekweani v. Ameriprise Fin., Inc*., 2010 WL 481647, at *8 (D. Ariz. Feb. 8, 2010). In this final analysis, the plaintiff "must do more than establish a prima facie [sic] case and deny the credibility of the [defendant's] witnesses." *Schuler v. Chronicle Broadcasting Co. Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986). Although a plaintiff may rely on circumstantial evidence to show pretext, such evidence must be both specific and substantial. *See Godwin v. Hunt Wesson*, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998).

The parties agree that Plaintiff engaged in protected activity when he: (1) filed his 2009 EEOC Charge, (2) filed his April 2012 EEOC Charge, (3) filed his November 2012 EEOC Charge, (4) assisted Ms. Wilson in filing her sexual harassment complaint, and (5) refused to follow orders to allegedly retaliate against Ms. Wilson.[22] Additionally, the parties agree that the alleged adverse employment actions Plaintiff suffered in this case were: (1) Plaintiff's May 2012 work fitness evaluation, (2) Plaintiff's placement on administrative leave[23] and his August 2012 work fitness evaluation, (3) Plaintiff's 2013

_____

[22] The Court disagrees with Plaintiff's allegation that his refusal to comply with Lt. Finley's orders, which he viewed as retaliatory, constitutes protected activity. For Plaintiff's refusal to comply with Lt. Finley's order to give Ms. Wilson a supervisory counseling and investigate her behavior to constitute protected activity, Lt. Finley's order must either violated Title VII or Plaintiff *reasonably* believed it violated Title VII. *See Westendorf v. W. Coast Contractors of Nevada, Inc*., 712 F.3d 417, 422 (9th Cir. 2013) ("An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law."). Plaintiff has demonstrated neither here. There is no evidence that Lt. Finley's order violated Title VII, nor was it reasonable for Plaintiff to believe that it did because, as Plaintiff conceded, Ms. Wilson engaged in inappropriate behavior that disrupted the workplace. (Doc. 175 at 77-81). Thus, it is unreasonable for Plaintiff to believe that Lt. Finley's order to investigate Ms. Wilson's behaviors that were unrelated to her EEOC claim was retaliatory. Nonetheless, as the City appears to concede that this action was protected activity, the Court will treat it so.

[23] Even though the City appears to concede that Plaintiff's placement on administrative leave was an adverse employment action, the Court questions whether it

- 18 -

1    Not Met PMG, and (4) Plaintiff's involuntary transfer from Robbery to Property.[24]

2        The parties vigorously dispute, however, whether Plaintiff established the but-for

3    causal link between his protected activity and the alleged adverse employment actions of

4    the City. (Doc. 129). Furthermore, the City argues that even if Plaintiff had met his *prima*

5    *facie* burden, Plaintiff failed to present sufficient evidence that the City's proffered reasons

6    for the alleged adverse employment actions were simply a pretext. (*Id.*) Plaintiff contends

7    that he has produced sufficient evidence to meet his *prima facie* burden.[25] Plaintiff does

8    not specifically argue that the City's legitimate, nondiscriminatory proffered reasons for

9    the alleged adverse employment actions at issue were simply a pretext; nonetheless, the

10   _____

11   was. As a matter of law, Plaintiff's placement on administrative leave in August 2012 was
     not an adverse employment action. *See Behan v. Lolo's Inc.*, 2019 WL 1382462, at *4 (D.
12   Ariz. Mar. 27, 2019) ("Placement on paid administrative leave, modified job
     responsibilities, social ostracization, and other 'mere inconveniences,' . . . will not
13   qualify[]" as an adverse employment action) (quoting *Foraker v. Apollo Grp., Inc.*, 427 F.
     Supp. 2d 936, 941–42 (D. Ariz. 2006))), *appeal dismissed*, 2019 WL 3384891 (9th Cir.
14   June 12, 2019). Nonetheless, because the City concedes it is an adverse employment
     action, the Court will treat it as such.

15   [24]   The Court disagrees with Plaintiff's allegations that the "not mets" he received on
16   his 2012 PMG were adverse employment actions. (Doc. 162 at 9 n.1). The anti-retaliation
     provision of Title VII "covers those (and only those) employer actions that would have
17   been materially adverse to a reasonable employee or job applicant . . . . [T]hat means that
     the employer's actions must be harmful to the point that they could well dissuade a
18   reasonable worker from making or supporting a charge of discrimination." *Burlington N.
     & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). An undesirable employment decision
19   is not inherently adverse. Furthermore, mediocre performance evaluations that do not give
     rise to any further negative employment actions are not adverse employment actions. *See*
20   *Lyons v. England*, 307 F.3d 1092, 1118 (9th Cir. 2002). Additionally, "[a]s a matter of
     law, unjust criticism and being treated rudely are not actionable, unless they rise to the
21   magnitude of a hostile work environment." *Kunzler*, 2001 WL 34053243, at *8. Plaintiff
     did not produce evidence that as a result of the "not mets" on his 2012 PMG he suffered
22   further negative employment action, nor has he alleged a theory of recovery that he was
     subjected to a hostile work environment as a form of retaliation. *See id.* Further, Plaintiff
23   abandoned this initial view that "assignment of goal and expectation documents, as well as
     unpunished accusations of insubordination and delays in getting a phone and desk, should
24   be considered adverse employment actions." (Doc. 61 at 11). Thus, the Court will not
     consider the "not mets" on Plaintiff's 2012 PMG as adverse employment actions. For the
25   same reason, the Court will also not consider the supervisory counselings or written
     reprimand to be adverse employment actions.

26   [25]   Plaintiff also appears to argue that the Court's Order denying the City's Motion for
27   Summary Judgment prevents the Court from granting the City's Rule 50 Motion. (Doc.
     162 at 11; Doc. 175 at 55). The Court disagrees. The Court's Order noted that the City
28   failed to provide any explanation for several of Plaintiff's alleged adverse employment
     actions, and that "omission" precluded summary judgment. (Doc. 61 at 12). The City has
     now addressed all of Plaintiff's alleged adverse employment actions.

Court will address the merits of a pretext argument. (Doc. 175 at 159-65; Doc. 162).

To meet his *prima facie* burden Plaintiff must demonstrate that any adverse actions taken against him were connected to his protected activity. In other words, Plaintiff must demonstrate that the alleged adverse employment actions would not have occurred but-for his protected activity. *See Nassar*, 570 U.S. at 362 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation, . . . [which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). Plaintiff bears the burden to show that his protected action was more than a mere "motivating factor" in the retaliation. *Stilwell v. City of Williams*, 831 F.3d 1234, 1247 (9th Cir. 2016) ("The [*Nassar*] Court explained that this burden on the plaintiff to 'establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer' is 'more demanding than the motivating-factor standard.'") (quoting *Nassar*, 570 U.S. at 362)). The Court will analyze the connection between each adverse action and the protected activity separately. Additionally, notwithstanding the weaknesses in Plaintiff's *prima facie* case, the Court will nonetheless also address his pretext arguments for each adverse employment action.

### A.      But-For Causation Under *Nassar*

Throughout the trial and in Plaintiff's written and oral Response to the City's Rule 50 Motion, Plaintiff's counsel failed to appreciate the difference in the causation standard for employees alleging *status-based* discrimination and employees alleging *retaliation*. In *Nassar*, the Court clearly explained the differences:

> An employee who alleges *status-based discrimination* under Title VII need not show that the causal link between injury and wrong is so close that the injury would not have occurred but for the act. So-called but-for causation is not the test. It suffices instead to show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision.
>
> . . . .
>
> [However,] Title VII *retaliation* claims must be proved according to traditional principles of but-for causation, not the lessened causation

- 20 -

test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.

*Nassar*, 570 U.S. at 343, 360 (emphasis added). Plaintiffs' misunderstanding is evident in the cases upon which he relies because they are primarily status-based discrimination decisions. Therefore, the Court does not find Plaintiff's cited cases persuasive as Plaintiff's burden to prove causation in his retaliation claims is more demanding than the motivating factor standard.

Plaintiff's timing argument also fails to appreciate the but-for causation standard created in *Nassar*.[26] "Under the pre-*Nassar* 'motivating factor' test, evidence of knowledge and proximity in time, together, *could have been* sufficient for the Court to find a disputed issue of fact on causation." *Drottz*, 2013 WL 6157858, at *15 (citation omitted and emphasis added). "Post-*Nassar*, however, 'while knowledge and proximity in time certainly remain relevant when inferring but-for causation,' they cannot form the sole basis on which an employee may satisfy his or her *prima facie* burden." *Shaninga v. St. Luke's Med. Ctr. LP,* 2016 WL 1408289, at *11 (D. Ariz. Apr. 11, 2016) (citing *Drottz*, 2013 WL 6157858, at *15); *see also Brooks*, 229 F.3d at 917 (acknowledging the concern that "employers will be paralyzed into inaction once an employee has lodged a complaint under Title VII, making such a complaint tantamount to a 'get out of jail free' card for employees engaged in job misconduct"); *Porter v. Mabus*, 2014 WL 4436303, at *4 (E.D. Cal. Sept. 9, 2014) ("Any EEOC claim . . . will take some time to resolve, and the Title VII anti retaliation [sic] provision does not serve to insulate an employee from any workplace grievance during the pendency of an EEOC claim, which often continue for several years. It must be demonstrated that the alleged retaliatory action was caused by the employee's

---

[26] Specifically, Plaintiff cites four cases—*Bell v. Clackamas County*, 341 F.3d 858, 865 (9th Cir. 2003); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002); *Passantino v. Johnson & Johnson Consumer Products, Inc*., 212 F.3d 493, 502 (9th Cir. 2000); *Miller v. Fairchild Indus., Inc.*, 885 F.2d 498, 505 (9th Cir. 1989), *as amended on denial of reh'g and reh'g en banc* (Sept. 19, 1989)—to support his proposition that temporal proximity alone is sufficient. (Doc. 162 at 9 n.2; Doc. 175 at 160-62). All of these cases were decided before *Nassar*.

- 21 -

protected activities, not merely that both actions occurred.").

Plaintiff's timing argument fits squarely within *Nassar's* proscription. To give credence to Plaintiff's understanding of the but-for causation standard would create a class of employees that were immune from the consequences of repeated poor performance and deserved critiques. Such a rule would place employers in an impossible dilemma as to an unsatisfactory employee who engages in protected activity: either keep him indefinitely or face legal action. Title VII "does not impose this Hobson's choice." *See Fleming v. IASIS Healthcare Corp.*, 151 F. Supp. 3d 1043, 1055 (D. Ariz. 2015). The sequence of events and the timing is certainly relevant evidence when inferring but-for causation; however, it cannot form the sole basis on which an employee may satisfy his *prima facie* burden. *See Shaninga* 2016 WL 1408289, at *11. Plaintiff's misunderstanding and misapplication of the causal connection required for a retaliation claim permeates his arguments which, in turn, grievously affected his case.

### B. Plaintiff's May 2012 Work Fitness Evaluation

Prior to Assistant Chief Pina referring Plaintiff for his May 2012 work fitness evaluation, Plaintiff had engaged in the following protected activity: (1) he filed his 2009 EEOC charge, (2) he filed his April 2012 EEOC charge, and (3) he assisted Ms. Wilson in filing her sexual harassment complaint. Plaintiff presented no evidence to establish that Assistant Chief Pina had knowledge of any of Plaintiff's protected activity.

#### i. But-For Causal Connection

Plaintiff's theory is that because he was referred to a work fitness evaluation two weeks after assisting Ms. Wilson with her complaint, over a month after he filed his April 2012 EEOC charge, and approximately two and half year after he filed his 2009 EEOC charge, "[t]his timing alone precludes judgment as a matter of law in favor of the City." (Doc. 162 at 9 n.2). The City contends that: (1) post-*Nassar*, timing alone is not enough to establish causation, and (2) the undisputed evidence established that Assistant Chief Pina, to whom no retaliatory animus or motive was attributed, ordered Plaintiff's first work fitness evaluation. (Doc. 129 at 4-5; Doc. 166 at 5).

Plaintiff relies entirely on temporal proximity to prove that his protected activity was the but-for cause of his May 2012 work fitness evaluation. However, without other evidence demonstrating that Assistant Chief Pina's decision to refer Plaintiff for a work fitness evaluation was because he filed his 2009 EEOC charge, his April 2012 EEOC charge, or assisted Ms. Wilson in filing her sexual harassment complaint, his allegations fall short of but for causation. *See Nassar*, 570 U.S. at 360 ("Title VII retaliation claims . . . require[] proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."). In the end, it takes more than allegations of temporal proximity to demonstrate but-for causation in a Title VII retaliation claim post-*Nassar*. *See Cheeks v. Gen. Dynamics,* 22 F. Supp. 3d 1015, 1036 (D. Ariz. 2014) ("Plaintiff provides no direct evidence of but-for causation, and instead asks the Court to infer causation through proximity in time and by inferring knowledge of the complaints on her superiors. The Court, however, does not find such inferences reasonable."), *order clarified,* 2014 WL 11514328 (D. Ariz. Nov. 18, 2014), *and aff'd in part sub nom. Cheeks v. Gen. Dynamics C4 Sys. Inc.,* 684 Fed. Appx. 658 (9th Cir. 2017).

Neither Assistant Chief Pina nor Lt. Messina testified. However, it is undisputed that Assistant Chief Pina referred Plaintiff for his first work fitness evaluation; yet there is no evidence or testimony to indicate that Assistant Chief Pina had any retaliatory animus towards him. While there is evidence to infer that Assistant Chief Pina knew of Plaintiff's 2009 EEOC charge, there is no evidence or testimony that he was aware of the April 2012 EEOC charge or that he knew Plaintiff had assisted Ms. Wilson file her complaint. *See Raad v. Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003) (finding decision maker's knowledge of protected activity necessary for causation). In the absence of evidence, it is not reasonable for the jury or Court to speculate who knew what information and when. *See Cheeks,* 22 F. Supp. 3d at 1036 (finding that plaintiff did not adduce any evidence that could lead to a reasonable inference that, at the relevant times, the decision makers knew of plaintiff's protected activity). This is all the more so because Plaintiff testified that he had no idea why Assistant Chief Pina ordered him to undergo the

May 2012 work fitness evaluation.  (Doc. 173 at 55) ("Q: Did you have a belief as to why [you were being subjected to a work fitness evaluation]? A: No. I had no idea.")).  Plaintiff had the burden to establish a link between his work fitness evaluation and his protected activity, yet he failed to provide evidence that could lead to a reasonable inference that Assistant Chief Pina had knowledge of Plaintiff's protected activity, and knowledge of protected activity is necessary to establish causation.  Accordingly, the Court finds that there was not a legally sufficient evidentiary basis for a reasonable jury to find that Plaintiff's engagement in protected activity was the but-for cause of his May 2012 work fitness evaluation.

### ii.    The City's Legitimate, Nonretaliatory Reasons

Notwithstanding the foregoing, even if the Court found that Plaintiff had successfully demonstrated that his protected activity was the but-for cause of his work fitness evaluation, thereby shifting the burden to the City, the City has articulated legitimate, nonretaliatory reasons for the work fitness evaluation.  For example, the City put forth evidence that prior to Assistant Chief Pina referring Plaintiff for the May 2012 work fitness evaluation, there were concerns regarding Plaintiff's behavior; specifically, Plaintiff's reactions to commonplace work events.  (Doc. 129 at 4-5; 175 at 52-58).  This concerning behavior included, Plaintiff's reaction to his first meeting with Lt. Messina where she provided him with a list of her expectations.  The uncontested testimony is that Plaintiff had never been a case-carrying detective, nor had he supervised a squad of case-carrying detectives; yet he perceived Lt. Messina's list of expectations and this innocuous meeting as hostile.  (Doc. 175 at 37-43).  Moreover, at the time that Assistant Chief Pina referred Plaintiff to the work fitness evaluation, PSB was investigating the February 9, 2012 incident where a warrant was served on the wrong address.  After the investigation, PSB found that in the process of obtaining and serving the warrant, Plaintiff violated a Police Department policy, failed to properly supervise, and neglected his duties.  (Doc. 175 at 58-59).  Plaintiff took stress-related leave soon after the February 9, 2012 warrant was incorrectly served.  And, shortly after his return, Plaintiff failed to inform Lt. Messina of a

violent kidnapping, in which shots were fired, as was required by the Goals Setting Worksheet. (*Id.* at 64).

The City's legitimate, nonretaliatory reasons for the work fitness evaluation are further bolstered by Dr. Lett's conclusions and recommendations following Plaintiff's May 2012 work fitness evaluation. Dr. Lett concluded that Plaintiff was fit to perform his duties *provided that* he attended weekly counseling for a month and then every other week for the following three months. (Doc. 175 at 68-70). The Court finds the City's reasons for requiring Plaintiff to undergo a work fitness evaluation to be legitimate and nonretaliatory.

### iii.    Pretext

Given the City's legitimate, nonretaliatory reasons for Plaintiff's May 2012 work fitness evaluation, Plaintiff now must show that: (1) the City's proffered reasons are unworthy of credence; or (2) retaliation was the more likely motivation. *See Green*, 265 F. Supp. 2d at 1124 (D. Ariz. 2003). Plaintiff testified that he had no idea why he was subjected to the May 2012 work fitness evaluation. (Doc. 175 at 55). Plaintiff again relies only on the temporal proximity between his May 2012 work fitness evaluation and his 2009 EEOC charge, his April 2012 EEOC charge, and his assistance with Ms. Wilson's sexual harassment complaint to demonstrate pretext. (Doc. 162 at 9 n.2). However, for the same reasons discussed above in the context of causal connection, temporal proximity, without more, is insufficient to establish pretext. *See Behan v. Lolo's Inc.*, 2019 WL 1382462, at *6 (D. Ariz. Mar. 27, 2019) (holding that timing alone "is not enough to create a triable issue of pretext"), *appeal dismissed*, 19-15874, 2019 WL 3384891 (9th Cir. June 12, 2019). As previously noted, Plaintiff did not provide evidence that could lead to a reasonable inference that Assistant Chief Pina knew of Plaintiff's protected activity when he referred Plaintiff for the work fitness evaluation. Thus, if there is no knowledge, then there can be no retaliation and if there is no retaliation, then there can be no showing of pretext. *See id.* at 1039 ("If there is no retaliation, there can be no showing of pretext.").

Therefore, even if Plaintiff had met his *prima facie* burden and successfully demonstrated that his protected activity was the but-for cause of his work fitness

evaluation, Plaintiff failed to present specific and substantial evidence of pretext to overcome the City's legitimate, nonretaliatory reasons for Assistant Chief Pina referring Plaintiff for the work fitness evaluation.

### C. Plaintiff's August 2012 Administrative Leave and September 2012 work fitness evaluation

Prior to Assistant Chief McClelland placing Plaintiff on administrative leave and Lt. Finley referring him for his second work fitness evaluation, Plaintiff had engaged in the following protected activity: (1) he filed his 2009 EEOC charge, (2) he filed his April 2012 EEOC charge, (3) Plaintiff assisted Ms. Wilson in filing her sexual harassment complaint, and (4) refused to follow Lt. Finley's order that Plaintiff believed was retaliatory. Plaintiff presented no evidence to establish that Assistant Chief McClelland or Lt. Finley had knowledge that Plaintiff had filed his 2009 EEOC charge, his April 2012 EEOC charge, or that he assisted Ms. Wilson in filing her sexual harassment complaint. From the evidence provided by Plaintiff, the only protected activity that Assistant Chief McClelland or Lt. Finley had knowledge of was Plaintiff's opposition to Lt. Finley's supposed order to retaliate against Ms. Wilson.

#### i. But-For Causal Connection

The City argues that Plaintiff has not presented evidence that his placement on administrative leave in August 2012 and his second work fitness evaluation in September 2012 were connected to Plaintiff's protected activity. (Doc. 129 at 5-7). Plaintiff contends that Lt. Finley was the decision maker[27] for these adverse employment actions and that the September 4, 2015 EEOC cause determination alone is sufficient to establish that Lt. Finley placed Plaintiff on administrative leave and required him to undergo the second work fitness examination in retaliation for his participation in protected activity. (Doc. 162 at 4-

---

[27] The City argues that Lt. Finley was not the decision maker for Plaintiff's August 2012 administrative leave, nor his September 2012 work fitness evaluation. Specifically, the City argues that Ms. Costa, a City Human Resources employee, was the decision maker for Plaintiff's second work fitness evaluation and that Assistant Chief McClelland was the decision maker for Plaintiff's administrative leave. The Court agrees in part. The Court agrees that Assistant Chief McClelland was the decision maker for Plaintiff's administrative leave; however, the Court finds that Lt. Finley was in fact the decision maker for Plaintiff's second work fitness evaluation. (Def. Ex. 66 at 5 (PHX001380)).

6).  The only evidence that Plaintiff introduced to establish a causal connection between his placement on administrative and his second work fitness evaluation was the EEOC's cause determination and his temporal proximity argument.

The Court disagrees that the EEOC's cause determination can hold the weight Plaintiff proposes.  To so find would essentially negate Plaintiff's *prima facie* burden to establish causal connection between the projected activity and the alleged adverse employment action.  *See Mondero v. Salt River Project*, 400 F.3d 1207, 1215 (9th Cir. 2005) ("The fact that a determination from the EEOC is highly probative, however, does not support [plaintiff's] contention that an EEOC determination letter is somehow a free pass through summary judgment."); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000) ("Moreover, the EEOC probable cause determinations in these cases carry little weight since they are conclusory and completely devoid of analysis.").  The problem with giving an EEOC cause determination such weight is heightened here, because undisputed evidence established that the EEOC relied on erroneous allegations.

The EEOC's cause determination responded to Plaintiff's allegations that because of *both* his assistance with Ms. Wilson's sexual harassment complaint *and* his refusal to follow Lt. Finley's order that *he thought* was retaliatory, *Lt. Finley* placed Plaintiff on administrative leave *and* required Plaintiff to undergo a fitness for duty examination. (Pl. Ex. 11).  However, Assistant Chief McClelland, not Lt. Finley, assigned Plaintiff to administrative leave.  Additionally, as noted earlier, it is uncontested that Lt. Finley did not know that Plaintiff helped Ms. Wilson file her sexual harassment complaint, a fact that that the EEOC incorrectly assumed in making its cause determination.  Furthermore, the cause determination does not articulate the basis or evidence on which it relied to conclude that Lt. Finley retaliated against Plaintiff.  Therefore, the Court cannot speculate whether the EEOC would have arrived at the same decision if it only considered the protected activity that Lt. Finley knew about and only the adverse employment actions that Lt. Finley was the decision maker for.  Consequently, the Court finds that EEOC cause determination here carries little weight because it relies on incorrect factual allegations.  Thus, the EEOC cause

determination cannot establish the necessary causal connection between Plaintiff's refusal to follow Lt. Finley's orders and his decision to refer Plaintiff for a work fitness evaluation, or Assistant Chief McClelland's decision to place him on administrative leave.

Plaintiff again argues that the temporal proximity between his opposition to Lt. Finley's alleged retaliatory orders and his placement on administrative leave and referral to his second work fitness exam are enough to satisfy the causal connection element. (Doc. 175 at 161). The Court disagrees. As previously discussed, Plaintiff's timing argument fails to appreciate the but-for causation standard dictated in *Nassar*. Accordingly, the Court finds that there was not a legally sufficient evidentiary basis for a reasonable jury to find that Plaintiff's engagement in protected activity was the but-for cause of his September 2012 work fitness evaluation and his placement on administrative leave in August 2012.

### ii. *The City's Legitimate, Nonretaliatory Reasons*

Notwithstanding the foregoing, even if Plaintiff had successfully proved that his protected activity was the but-for cause of his placement on administrative leave and his second work fitness evaluation, thereby shifting the burden to the City, the City introduced legitimate, nonretaliatory reasons for theses alleged adverse employment actions. Included therein was testimony that Plaintiff failed to openly and effectively communicate and timely submit supervisory notes and case management reviews. Additionally, the City argues that Plaintiff's erratic behavior on August 8, 2012, specifically in his meetings with Lt. Finley and Assistant Chief McClelland, prompted his placement on administrative leave and a second work fitness evaluation. (Doc. 166 at 6). Additionally, the City argues that Dr. Lett's report following Plaintiff's second work fitness evaluation supports the decision to place Plaintiff on administrative leave and to refer him for the second work fitness evaluation. Dr. Lett concluded that Plaintiff was "psychologically fit to perform his job as a Police Sergeant [sic] *provided* that he engages in behavior health treatment . . . ." (Def. Ex. 66 at 18 (PHX001393)) (emphasis added). Dr. Lett specified that Plaintiff should complete a psychiatric consultation and receive a treatment plan "prior to returning to full

duty[,]" and he remarked that Plaintiff presented with personality traits that included "suspiciousness, lack of trust, and conflict with authority . . . ." (*Id.*) The City's reasons for placing Plaintiff on administrative leave and referring him for the second work fitness evaluation were legitimate and nonretaliatory.

### iii. Pretext

Plaintiff relies on the same evidence—the EEOC cause determination—to support his argument that the City's proffered reasons were pretext. As with Plaintiff's causal connection argument, the Court finds that the EEOC cause determination alone is not enough for a pretext argument to succeed. *See Green*, 265 F. Supp. 2d at 1129 (finding that the EEOC cause determination did not establish any evidence of pretext because there was no evidence that the EEOC interviewed the decision maker, nor was there evidence that the EEOC evaluated the defendant's proffered legitimate reason for the alleged adverse employment action). Plaintiff also argues that Lt. Finley's fears of him were unfounded. Plaintiff's argument again misses the mark. To demonstrate pretext, Plaintiff would have had to demonstrate that Lt. Finley's fears were not honest fears. *See Green*, 265 F. Supp. 2d at 1128 ("'The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered.'") (quoting *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000))). Whether Lt. Finley's fears were justified is not the focus of the inquiry; rather the question is whether Lt. Finley's fear was honestly held. The City argues that even if Lt. Finley's fears of Plaintiff were unjustified, there is no evidence refuting that his fears were not honestly held. [28] (Doc. 129 at 4-7). Plaintiff's

---

[28] In a pretrial Order, the Court held that the only relevancy of Plaintiff's 2009 EEOC was that it had occurred and had been resolved. (Doc. 92 at 2). In light of that ruling, the City objected during trial to Plaintiff's questioning of Ms. Beane, an EOD employee, regarding the investigation of Plaintiff's 2009 EEOC charge. The Court held a sidebar, during which Plaintiff argued that the EOD's investigations were relevant because, among other things, it could be used to demonstrate pretext. (Doc. 172 at 201-05). The Court asked Plaintiff to clarify his relevancy arguments as to the EOD's investigation of Plaintiff's 2009 EEOC charge separately from this relevancy arguments as to the EOD's investigation of Plaintiff's April and November 2012 EEOC charges. (*Id.* at 205-06). The Court upheld its pretrial ruling, finding that the EOD's investigation of Plaintiff's 2009 EEOC charge was irrelevant to Plaintiff's current lawsuit. (*Id.* at 205). However, when asked about the relevancy of EOD's investigations in Plaintiff's April and November 2012 EEOC charges, Plaintiff only argued that the failure to adequately investigate is in itself retaliation. (*Id.* at 206-09). The Court preliminary held that the EOD's investigations

only assertion is that Lt. Finley is an experienced police officer thus his fears of Plaintiff were unreasonable.

Therefore, even if Plaintiff had met his *prima facie* burden and successfully demonstrated that his protected activity was the but-for cause of his assignment to administrative leave or his second work fitness evaluation, Plaintiff failed to present specific and substantial evidence of pretext to overcome the City's legitimate, nonretaliatory reasons for Lt. Finley's decision to refer Plaintiff for a work fitness evaluation and Assistant Chief McClelland's decision to place Plaintiff on administrative leave.

### D. Plaintiff's 2013 "Not Met" PMG

Prior to Lt. Collins giving Plaintiff the 2013 Not Met PMG, Plaintiff had engaged in the following protected activity: (1) he filed his 2009 EEOC charge, (2) he filed his April 2012 EEOC charge, (3) Plaintiff assisted Ms. Wilson in filing her sexual harassment complaint, (4) refused to follow Lt. Finley's order that Plaintiff believed was retaliatory, and (5) filed his November 2012 EEOC charge. Plaintiff only presented evidence to infer that Lt. Collins had knowledge of Plaintiff's 2009 EEOC charge, from when Lt. Collins was at PSB, and that he was generally aware that Plaintiff had accused Lt. Finley of ordering his to retaliate against Ms. Wilson.

#### i. *But-For Causal Connection*

The City argues that Plaintiff failed to introduce evidence to demonstrate that Lt. Collins knew of Plaintiff's protected activity and that his decision to give the 2013 Not Met PMG was because of Plaintiff's protected activity. (Doc. 129 at 2-4). Plaintiff contends that there is evidence that Lt. Collins knew Plaintiff had accused Lt. Finley of ordering

---

into Plaintiff's April and November 2012 EEOC charges was irrelevant to Plaintiff's case; however, the Court indicated that it would further research the issue. (*Id.* at 209-10). The following day, the Court permitted the parties to further argue the issue. (Doc. 173 at 3-10). Plaintiff—relying on *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1033 (9th Cir. 2006) and *Hunter v. County of Sacramento*, 652 F.3d 1225, 1234 (9th Cir. 2011)— argued that the EOD's investigation was relevant because the EOD's failure to conduct a proper investigation was in itself an adverse employment action. (*Id.*) Based on Plaintiff's arguments, the Court held that Plaintiff's Complaint did not contain a claim for retaliation based on a hostile work environment theory, and therefore, the EOD's investigation was irrelevant.

Plaintiff to retaliate against Ms. Wilson and knew that Plaintiff had "EEO, EOD issues" and gave Plaintiff the 2013 Not Met PMG as a result. (Doc. 162 at 6-8). Plaintiff also generally argues that Lt. Collins displayed bias against him. Plaintiff further argues that even if there is not evidence that Lt. Collins's had retaliatory animus towards Plaintiff, there is evidence that Plaintiff's 2013 Not Met PMG was based on Lt. Finley's input and therefore, Lt. Finley's retaliatory animus towards Plaintiff should be imputed to Lt. Collins. (*Id.* at 8-9).

Plaintiff first contends that Lt. Collins knew that he had engaged in protected activity. Plaintiff is correct. Lt. Collins testified that he was aware that Plaintiff had "'EEO, EOD issues[,]'" and that Plaintiff had accused Lt. Finley of ordering him to retaliate against Ms. Wilson. (Doc. 162 at 6-7; Doc. 171 at 71, 75). However, Lt. Collins testified that he did not know that Plaintiff had filed his November 2012 EEOC charge, nor was he aware of the substance of Plaintiff's other EEOC charges. (Doc. 171 at 75-76; 80-81). Therefore, Plaintiff sufficiently established that Lt. Collins's had knowledge of some of Plaintiff's protected activity. *See Raad*, 323 F.3d at 1197 (finding decision maker's knowledge of protected activity necessary for causation). Nonetheless, Plaintiff does not establish a causal connection between Lt. Collins's knowledge of those events and Plaintiff's 2013 Not Met PMG. (Doc. 162 at 6-7). Plaintiff also does not connect Lt. Finley's knowledge of his protected activity to Lt. Collin's decision to give Plaintiff the 2013 Not Met PMG.

Plaintiff argues that the evidence shows that Lt. Collins generally displayed bias against Plaintiff. Plaintiff testified that Lt. Collins told him he had been in Robbery for "a year and a half and it's time to go." (Doc. 162 at 7; Doc. 174 at 36). Lt. Collins denies making that statement. (Doc. 171 at 145-46). Nonetheless, viewing the evidence in Plaintiff's favor, the Court gives credence to his belief that this showed some bias. Plaintiff also argues that Lt. Collins demonstrated bias by keeping him on "desk duty" and by disciplining Plaintiff, "a supervisory officer with the Department with many years of

experience[,] for merely fetching a cup of coffee without asking permission."[29] (Doc. 162 at 7). However, those alleged displays of bias are not adverse employment actions. *See Kunzler*, 2001 WL 34053243, at *8 (finding that as a matter of law, unjust criticism and being treated rudely are not adverse employment actions). It is not enough for Plaintiff to show that Lt. Collins was biased; Plaintiff must show that Lt. Collins subjected him to an adverse employment action because of his protected activity. Bias is not necessarily evidence of retaliation.

Additionally, Plaintiff argues that even if there is insufficient evidence to suggest that Lt. Collins gave Plaintiff the 2013 Not Met PMG in retaliation for engaging in protected activity, such retaliatory animus can be imputed from Lt. Finley.[30] As a PMG covers a twelve-month period, Lt. Collins testified that he completed the 2013 PMG with input from Lt. Finley, who had supervised Plaintiff for six-months of the twelve-month period. (Doc. 171 at 68). Lt. Collins testified that even though he included Lt. Finley's observations of Plaintiff's performance in the 2013 PMG, Lt. Collins's opinions were not based on Lt. Finley's observations. (Doc. 171 at 90-91). Instead, Lt. Collins testified that he "start[ed] from ground zero" with Plaintiff, but within the six months that he supervised Plaintiff he saw similar issues that Lt. Finley had observed and documented. (Doc. 171 at 91). Lt. Collins further testified that the 2013 Not Met PMG was based on a "series of issues during the six months[]" that he supervised Plaintiff. (*Id.* at 100). Plaintiff did not produce evidence to contradict this testimony. Thus, while Lt. Finley's observations may have been included, there is no evidence, only conjecture, that Lt. Finley's opinions or observations influenced Lt. Collins's decision to give Plaintiff an overall performance expectation of "not met."

Plaintiff's attempt to use a "cat's-paw theory" of liability to impute Lt. Finley's

---

[29] Lt. Collins testified that he was not aware that Lt. Finley had modified Plaintiff's desk duty permitting him to take coffee and lunch breaks. Thus, the erroneous directive is undisputed.

[30] This is known as a "cat's paw" theory of liability, which is typically used when a plaintiff "cannot show that the decisionmaker—the person who took the adverse employment action—harbored any retaliatory animus." *Acosta v. Brain*, 910 F.3d 502, 514 (9th Cir. 2018) (quoting *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015)).

retaliatory animus to Lt. Collins fails because Plaintiff has not produced evidence showing that Lt. Collins's decision to give Plaintiff the 2013 Not Met PMG was influenced by Lt. Finley. *See Acosta v. Brain*, 910 F.3d 502, 514 (9th Cir. 2018) ("Under [a cat's paw] theory, a plaintiff must establish that the person with a retaliatory motive somehow influenced the decisionmaker to take the retaliatory action. Put another way, a plaintiff must show that the person with retaliatory animus used the decisionmaker to bring about the intended retaliatory action.") (quoting *Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015))). In sum, Plaintiff did not produce evidence to establish that Lt. Finley's influence with Lt. Collins was strong enough to have caused Lt. Collins to give Plaintiff the 2013 Not Met PMG. *See Acosta*, 910 F.3d at 515. Thus, Plaintiff has not successfully raised a cat's paw theory of liability as it relates to the 2013 Not Met PMG.

Accordingly, the Court finds that there was not a legally sufficient evidentiary basis for a reasonable jury to find that Plaintiff's engagement in protected activity was the but-for cause of his 2013 Not Met PMG.

### ii. The City's Legitimate, Nonretaliatory Reasons

Notwithstanding the foregoing, even if the Court found that Plaintiff had successfully demonstrated that his protected activity was the but-for cause of 2013 Not Met PMG, thereby shifting the burden to the City, the City has articulated legitimate, nonretaliatory reasons for this alleged adverse employment action.

The City argues that Plaintiff's 2013 Not Met PMG was a result of Plaintiff inadequately performing his duties as a sergeant in Robbery. (Doc. 129 at 4-5). The City produced uncontradicted evidence that Plaintiff had accidently arrived a week early for a work-related training in Colorado, which required other Robbery sergeants to cover his shifts for the unscheduled week he was gone; Plaintiff received four supervisory counselings, which included supervisory counselings for failing to complete employee notes and case management inspections timely and failure to adequately review a search warrant; and after an internal investigation, Plaintiff received a written reprimand for displaying unprofessional conduct on two different occasions. (Def. Exs. 78, 80, 81; Doc.

175 at 90-98, 101-04, 111-17).  The Court agrees that these are legitimate, nonretaliatory reasons for Plaintiff's 2013 Not Met PMG.  *See Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985) ("An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals.").

### iii.    *Pretext*

Accordingly, the burden shifts to Plaintiff to show facts indicating that the City's explanation is a pretext.  Plaintiff argues: that (1) his 2013 Not Met PMG failed to account for the many robbery investigations he solved; (2) that Lt. Collins was generally biased; and (3) that even if there is insufficient evidence that Lt. Collins's had retaliatory animus against Plaintiff, there is evidence that Plaintiff's 2013 Not Met PMG was based on Lt. Finley's input and therefore, Lt. Finley's retaliatory animus towards Plaintiff should be imputed to Lt. Collins.

Tellingly, Plaintiff testified that (1) he went to Colorado a week early for a work-related training (Doc. 175 at 111-12), (2) he received a written reprimand for leaving his desk on two different occasions despite being assigned to desk duty (*Id.* at 115-16), (3) he received a supervisory counseling for failing to properly review a search warrant for accuracy (*Id.* at 93-94), and (4) he failed to timely submit employee notes and case management reports (*Id.* at 89-90).  Plaintiff did not refute that these incidents merit a "not met" PMG.  Rather Plaintiff argues that prior to receiving his 2013 Not Met PMG, he believed he was doing a good job and that Lt. Collins had commended him on successfully supervising several robbery "stringer"[31] investigations, even stating that "'[w]hile working the [seven named robbery stringer investigations and several other unnamed investigations], you were able to work with other members of the Robbery Unit and get the

---

[31]    A stringer is an individual or group of individuals that commit several similar robberies. (Doc 171 at 47-48).  Many stringers are cleverly named.  For example, some of the stringers investigations that Plaintiff "successfully supervised" included, the "Doc Oc, Red Truck Bandits, Silver Dollar Bandits, Ice Breaker Bandits, Grinder Bandits, Fire and Ice Bandits, Musket Bandits . . ."  (*Id.* at 49-50).

job done.'" (*Id.* at 28; Def. Ex. 78 at 9 (PHX001146)). However, Plaintiff's reliance on his own perception of his work performance is misplaced. *See Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (holding that an employee's subjective beliefs about her own job competence are insufficient to show pretext). Additionally, although his 2013 Not Met PMG did contain some praise, Plaintiff overlooks the numerous comments regarding specific instances in which his behavior did not meet standards. In other words, some praise in his 2013 Not Met PMG does not aid his pretext argument. *See Ekweani*, 2010 WL 481647, at *7. Furthermore, as previously discussed, Plaintiff did not present sufficient evidence to demonstrate that Lt. Finley influenced Lt. Collins decision to give Plaintiff his 2013 Not Met PMG. *See Green*, 265 F. Supp. 2d at 1130 n.7 (holding that statements by non-decision makers not generally probative of whether explanation for decision was pretextual)).

Therefore, even if Plaintiff had met his *prima facie* burden and successfully demonstrated that his protected activity was the but-for cause of his 2013 Not Met PMG, Plaintiff failed to present specific and substantial evidence of pretext to overcome the City's legitimate, nonretaliatory reasons for Plaintiff's 2013 Not Met PMG.

### E.    Plaintiff's 2013 Involuntary Transfer to Property

Prior to Lt. Collins transferring Plaintiff to Property, Plaintiff had engaged in the following protected activity: (1) he filed his 2009 EEOC charge, (2) he filed his April 2012 EEOC charge, (3) he assisted Ms. Wilson in filing her sexual harassment complaint, (4) he refused to follow Lt. Finley's order that he believed was retaliatory, and (5) he filed his November 2012 EEOC charge. Plaintiff only presented evidence to infer that Lt. Collins had knowledge of Plaintiff's 2009 EEOC charge, from when Lt. Collins was at PSB, and he was generally aware that Plaintiff had accused Lt. Finley of ordering him to retaliate against Ms. Wilson.

#### i.    *But-For Causal Connection*

The City contends that there is no evidence that Lt. Collins recommended that Plaintiff be transferred from Robbery to Property because of Plaintiff's protected activities.

(Doc. 129 at 2-4). Plaintiff fails to respond to this argument in his Response, nonetheless, the Court will address the merits of the argument. (Doc. 162; Doc. 175 at 158-65). Plaintiff did not introduce evidence of a causal connection between the protected activity and Lt. Collins's recommendation that Plaintiff be transferred from Robbery to Property. *See Unt*, 765 F.2d at 1446 ("An employee is not protected by Title VII when he violates legitimate company rules, knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals."). Accordingly, the Court finds that there was not a legally sufficient evidentiary basis for a reasonable jury to find that Plaintiff's engagement in protected activity was the but-for cause of his transfer to Property.

### ii. The City's Legitimate, Nonretaliatory Reasons

Notwithstanding the foregoing, had the Court found that Plaintiff had successfully demonstrated that his protected activity was the but-for cause of his transfer to Property, thereby shifting the burden to the City, the City has articulated legitimate, nonretaliatory reasons for this alleged adverse employment action. The City argues that Lt. Collins's decision to transfer Plaintiff to Property was a result of Plaintiff's inability to meet his supervisory responsibilities in Robbery and his 2013 Not Met PMG. (Doc. 129 at 3-4). The Court agrees that these are legitimate, nondiscriminatory reasons for Plaintiff's transfer. *See Brooks v. Capistrano Unified Sch. Dist.*, 1 F. Supp. 3d 1029, 1038 (C.D. Cal. 2014) ("The [reported incidents of poor judgment and inappropriate conduct on plaintiffs' part], whether true or not, provide a legitimate, non-retaliatory reason for the [defendant's] decision.").

### iii. Pretext

Plaintiff must now show facts indicating that the City's explanation is a pretext. Plaintiff does not challenge that he was transferred because of the 2013 Not Met PMG; rather he argues that he did not deserve the "not met." This is not the relevant inquiry. The goal of the pretext inquiry is not to determine whether the City made the best employment decision or even a well-considered one. *See Green*, 265 F.Supp.2d at 1128. Rather, the

goal is to determine the extent to which the City's explanation of its actions is a guise for unlawful retaliation.  *See Ekweani*, 2010 WL 481647, at *8.  Plaintiff did not put forth evidence that the City's explanation of its actions was a guise for unlawful retaliation. Therefore, Plaintiff failed to produce specific and substantial evidence that the Lt. Collins's reasons for transferring Plaintiff were pretextual.

## V.    CONCLUSION

The Court finds that "a reasonable jury would not have a legally sufficient evidentiary basis to find for" Plaintiff on his Title VII retaliation claim."  Fed. R. Civ. P. 50(a)(1).  Without considering the credibility of witnesses or otherwise weighing the evidence, and drawing all reasonable inferences in Plaintiff's favor, the only conclusion that reasonable jurors could have reached is that Plaintiff failed to establish his *prima facie* case of retaliation.  The Court finds, as a matter of law, that Plaintiff's four alleged instances of retaliation do not satisfy his *prima facie* burden because he did not establish the necessary causal link between the alleged adverse employment actions and his protected activity.  Furthermore, even if Plaintiff had satisfied his *prima facie* burden, the City offered legitimate, nonretaliatory reasons for the alleged adverse employment actions and that Plaintiff's timing argument is insufficient to demonstrate that the City's reasons were pretextual.  In sum, the Court will grant the City's Rule 50 Motion because the jury's verdict is legally erroneous and against the great weight of the evidence.

Accordingly,

**IT IS ORDERED** that the City's Motion for Rule 50 Judgment as a Matter of Law (Doc. 129) is **GRANTED**.  The Court respectfully requests that the Clerk of Court enter judgment in favor of the City and terminate this matter in its entirety.

Dated this 26th day of August, 2019.

Honorable Diane J. Humetewa
United States District Judge